## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

BRUNSON ROBERTS,
ADC #127841                                                         PLAINTIFF

V.                                    5:14CV00054 BSM/JTR

RAY HOBBS, Director,
Arkansas Department of Correction, et al.                          DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States Chief District Judge Brian S. Miller. Any party may file written objections to this Recommendation. Objections must be specific and include the factual or legal basis for disagreeing with the Recommendation. An objection to a factual finding must specifically identify the finding of fact believed to be wrong and describe the evidence that supports that belief.

An original and one copy of the objections must be received in the office of the United States District Clerk within fourteen (14) days of this Recommendation. If no objections are filed, Judge Miller can adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may also waive any right to appeal questions of fact.

# I.  Introduction

Plaintiff, Brunson Roberts, is a prisoner in the Varner Super Max Unit of the Arkansas Department of Correction ("ADC").  He has filed this *pro se* § 1983 action alleging that Defendants Ray Hobbs, Marvin Evans, Larry May, Shelli Maroney, Hazel Jackson, Charlotte Sumner, and Miriam Lester retaliated against him and racially discriminated against him by purposefully miscalculating his transfer eligibility date ("TE date").[1]  *Doc. 21.*

The parties have filed Cross Motions for Summary Judgment and supporting briefs.  *Docs. 47, 48, 49, 66 through 73,  77, 78, & 82.*  For the following reasons, the Court recommends that: (1) Defendants' Motion for Summary Judgment be granted; (2) Plaintiff's Motion for Summary Judgment be denied; and (3) the case be dismissed,

---

[1]  Under the Arkansas statutes, an inmate's TE date is the earliest date he is *eligible* for transfer from the ADC to the Department of Community Correction.  The Department of Community Correction then decides whether a prisoner should be paroled or assigned to a less restrictive form of confinement such, as a work release program.  *See* Ark. Code Ann. § 16-3-1202.

As explained in the March 10, 2014 screening Order, early release is *discretionary* under Arkansas law.  *Doc. 7.* Thus, Plaintiff does *not* have a federal protected due process right to the possibility of early release.  *Id.* Similarly, he does *not* have a federally protected due process right to have prison officials correctly calculate his TE date pursuant to state law or internal prison rules. *Id.  That is a matter Plaintiff must raise in state court* in either a petition for a declaratory judgment or a writ of mandamus.  *See* Ark. Code Ann. § 16-115-101; *Roberts v. Hobbs,* 2014 WL 1345341 (E.D. Ark. 2014) (unpublished opinion) (explaining, in a § 2254 habeas case, that Plaintiff must challenge the calculation of his TE date in state court).

*Thus, the sole issues in this federal civil rights case are whether Defendants retaliated or racially discriminated against Plaintiff, and not whether they are correctly calculating his TE date pursuant to state law or ADC regulations.*

with prejuduice.[2]

## II.  Undisputed Facts

In 2002, Plaintiff was convicted in the Pulaski County Circuit Court of possessing cocaine, failing to appear in court, violating probation, and possessing drug paraphernalia with the intent to manufacture methamphetamine.  *Doc. 48, at Ex. 1.* As a habitual offender, he was sentenced to a total of 33 years in prison:  (1) a 23 year combined sentence on the cocaine, failing to appear, and probation convictions; and (2) a 10 year *consecutive* sentence on the methamphetamine conviction.  *Id.*

On March 6, 2003, Plaintiff arrived at the ADC.  *Doc. 48 at Ex. 1.* At that time, he had not yet earned any good time credits.[3] Thus, his release or "discharge" date was

---

[2]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  *Celotex,* 477 U.S. at 323. Once that has been done, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial.  *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).

[3] Plaintiff's TE date is determined by the number of good time credits (or days) he earns. The rate at which Plaintiff accumulates good time credits is based on his classification ("class"). Class 1, which is given when Plaintiff consistently abides by prison rules, allows him to earn the most good time credits each month.  In contrast, Plaintiff can not earn any good time credits when he is Class 4.  As punishment for receiving a disciplinary conviction, Plaintiff can: (1) lose all or some the good time credits he has *already* earned; and (2) be demoted in class, thereby temporarily decreasing or eliminating his ability to earn *future* good time credits. Thus, Plaintiff's TE date is directly tied to his disciplinary history.  Additionally, prison officials can restore previously forfeited good time credits to reward Plaintiff's good behavior. Thus, Plaintiff's TE is constantly changing and can only be "projected," on any given day,  by the amount of good time credits he current has and how many good time credits he could, *theoretically*, earn if he maintains his current class. *See* Ark.

August 3, 2035, which was calculated based on the *assumption* that Plaintiff would serve his entire 33 year sentence, minus the time he has already served in jail prior to his arrival at the ADC. *Id.*

By June 15, 2005, Plaintiff had achieved class 1 status and earned a considerable amount of good time credits.[4] *Doc. 71 at Ex. 3.* Consequently, his projected TE date had changed to May 30, 2014. *Id.* Importantly, the ADC document containing that information specifically advised Plaintiff that the May 30, 2014 TE date was "*only a projection* and includes all good time credit which *can be* earned based on your current status," and that "[i]f all protected good time is not earned, the release date will change."[5] *Id.* (emphasis added).

Plaintiff, however, did not maintain class 1 status. Instead, by November 18, 2014, he had received *at least sixty-nine disciplinary convictions. Doc. 48 at Ex. 1.* As punishment, Plaintiff lost most of the good time credits he had previously earned, and his class was demoted numerous times resulting in the temporary suspension or reduction of his ability to earn future good time credits. *Id.* As a result, by November 18, 2014, Plaintiff's projected TE date had changed from May 30, 2014 to April 2,

---

Code Ann. §§ 12-29-201 and 16-93-611; *Doc. 48 at Exs. 2, 3, & 4.*

[4] It is impossible to determine how many good time credits Plaintiff actually had on that date.

[5] That admonishment was repeated each time Plaintiff received a new TE calculation. *Doc. 71.*

2017.  *Doc. 48 at Ex. 5; Doc. 71 at Ex. 3.*

Thereafter, Plaintiff improved his behavior. As a reward, prison officials restored some of his previously revoked good time credits and they gradually increased his class.  *Doc. 48 at Ex. 1.*  By March 5, 2015, which is the last TE calculation in the record, Plaintiff had achieved class 1 status.  *Doc. 78 at 2.*  Thus, on March 5, 2015, Plaintiff's projected TE date, *assuming he does not receive any more disciplinary convictions and maintains a class 1 status*, is August 17, 2016.  *Id.*

### III. Discussion

#### A.   Retaliation Claim

Plaintiff alleges that Defendants have purposefully miscalculated his TE date in retaliation for him filing numerous grievances and lawsuits.  To prevail on that claim, Plaintiff must prove that: (1) he engaged in constitutionally protected activity; (2) Defendants took adverse action against him that would chill a person of ordinary firmness from engaging in that activity; and (3) retaliation was the actual motivating factor for the adverse action. *See Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007); *Revels v. Vincenz,* 382 F.3d 870, 876 (8th Cir. 2004).

It is undisputed that Plaintiff engaged in constitutionally protected activity when he filed grievances and lawsuits. *See Lewis*, 486 F.3d at 1029 ("The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment

activity"). However, Plaintiff has failed to come forward with *any evidence* to substantiate his claim that Defendants purposefully miscalculated his TE date to retaliate against him for engaging in those constitutionally protected activities.

Because his TE date frequently changed and sometimes those changes occurred around the same time that he filed grievances, Plaintiff *speculates* that Defendants must have been retaliating against him. That argument overlooks the undisputed fact that Plaintiff's TE frequently changed as a result of him receiving *at least sixty-nine disciplinary convictions. Doc. 48 at Ex. 1*. Plaintiff often filed grievances about what he believed to be unfair treatment during his disciplinary proceedings. *Docs. 70 & 71*. Because *the disciplinary convictions caused his TE date to be extended*, and many of his grievances were filed complaining about the disciplinary convictions, Plaintiff erroneous speculates that his filing of grievances caused his TE date to be extended. The undisputed facts make it clear *there was no such cause and effect relationship* between Plaintiff filing grievances complaining about his disciplinary convictions and his TE date being extended.

Plaintiff also bases his retaliation argument on a change in Arkansas law that occurred in 2009. Prior to that time, Plaintiff was required to serve at least 70% of his methamphetamine sentence before being eligible for transfer to the Department of

Community Correction ("70% rule").[6] *See* Act 1034 of 2005 (codified at Ark. Code. Ann. § 16-93-611). In 2009, the law changed to allow Plaintiff to, retroactively, be eligible for transfer on his methamphetamine conviction after serving 50% of that sentence. *See* Act 363 of 2009 (codified at Ark. Code Ann. § 16-93-611). Thus, Plaintiff once again speculates that his projected TE date should have improved in 2009, and the fact that it did not do so, can only mean that Defendants were retaliating against him. Apart from the entirely speculative nature of this argument, it ignores the fact that, even though he was *eligible to earn* more good time credits as a result of the 2009 change in the law, *his numerous disciplinary convictions prevented him from actually doing so.*[7] In other words, Plaintiff's TE date worsened as a result of *his own behavior.* Only his own subjective opinion supports the notion that his TE date changed due to any retaliatory motives of the Defendants.

Finally, Plaintiff speculates that Defendants retaliated against him based on his subjective interpretation of four New Release Date Calculation Sheets ("Calculation Sheets"). *Doc. 69 at Exs. 1, 2, 3, & 4.* Plaintiff mistakeny assumes that, because the

_____

[6] That 70% rule applied *only* to Plaintiff's 10 year sentence on the methamphetamine conviction. There were and are no restrictions on Plaintiff's ability to earn good time credits on his combined 23 year sentence for his cocaine, failure to appear, and probation convictions. *Id.*

[7] As previously noted, on June 15, 2005, Plaintiff's projected TE date -- *assuming* he had maintained class 1 and avoided losing any good time credits -- was May 30, 2014. Of course, that assumption proved to be incorrect. *In fact,* over the next four years, Plaintiff received *thirty-nine new disciplinary convictions.* Thus, on December 17, 2009, Plaintiff's projected parole date became August 19, 2015. *Doc. 48 at Ex. 1; Doc. 71 at Exs. 3 & 6*

dates are different on each of those four Calculation Sheets, Defendants must have purposefully manipulated the data to retaliate against him.

As explained in Defendant Lester's affidavit, those Calculation Sheets were generated  using a "test mode" computer program to show Plaintiff how his 10 year methamphetamine sentence was calculated before and after the 70% rule was changed in 2009. *Doc. 77 at Ex. 1.* The left column of the Calculation Sheets, which is labeled "Minimum Release," does not change, because it shows how Plaintiff's 33 years sentence runs, *if he serves every day on that sentence and is not awarded any good time credits.*[8] *Doc. 48 at Exs. 2, 3, and 4; Doc. 69 at Exs. 1, 2, 3, & 4; Doc. 77 at Ex. 1.*  However, the right column of the Calculation Sheet, which is labeled "Transfer Eligibility Date," has different data on each of the four Calculation Sheets because it demonstrates how Plaintiff's TE date was calculated -- on a particular date -- depending on how many good timed credits Plaintiff had on that date, the good time credits he could earn in the future if he maintained the class he had on that date, and

---

[8]   As previously mentioned, Plaintiff's 10 year methamphetamine conviction runs *consecutively*  to the 23 year sentence he received for his cocaine, failure to appear, and probation convictions. *Doc. 48 at Ex. 1* The "Minimum Release" date on each of the Calculation sheets shows that  Plaintiff will complete his 23 year sentence for those three convictions on August 25, 2025. That date is labeled "Sentence Begins Date" because it is the date Plaintiff's *consecutive* 10 year methamphetamine sentence begins.  Plaintiff will complete that 10 year sentence on August 3, 2035, which is labeled the "Maximum Release Date."  *Doc. 48 at Exs. 2, 3, and 4; Doc. 69 at Exs. 1, 2, 3, & 4; Doc. 77 at Ex. 1.*

the Arkansas law in effect on that date.[9] *Id.  Id.*  In other words, the data in the Transfer Eligibility Columns on each of the four Calculation Sheets is different due to changes in Arkansas law and Plaintiff's disciplinary history.  There is simply *no evidence* to support Plaintiff's speculative belief that Defendants some how manipulated those dates to retaliate against him.

Thus, Plaintiff has failed to produce *any* evidence demonstrating that Defendants miscalculated his transfer eligibility date in retaliation for him filing grievances and lawsuits. *See Lewis,* 486 F.3d at 1029 (explaining that "to avoid summary judgment," a prisoner must "submit affirmative evidence of a retaliatory motive"); *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006) (same).

---

[9] For instance, the "Transfer Eligibility" column of the Calculation Sheet labeled "Plaintiff's Example 1" demonstrates how Plaintiff's TE date was calculated on April 20, 2005.  As of April 20, 2005 (which is labeled as the "Time Served To" date), Plaintiff had a projected "TE date" of May 30, 2014.  That calculation was based on Plaintiff maintaining his class 1 status, earning the maximum good time credits possible, and not having any good time credits forfeited during disciplinary proceedings.  *If Plaintiff had done so,* those good credits would have been applied *first* to his 23 year sentence, which would have ended on June 22, 2007.  Consequently, Plaintiff's 10 year *consecutive* methamphetamine sentence would have started on June 22, 2007 (which is labeled his "Sentence Begins Date").  At that time, Arkansas law required Plaintiff to serve 70% (or 7 years) of his 10 year methamphetamine sentence.  Thus, *if* Plaintiff had continued to earn and keep of all his good time credits, his methamphetamine sentence would have begun on June 22, 2007 ("Sentence Begins Date") and ended approximately 7 years later on May 30, 2014 ("TE date").

The remaining Calculation Sheets demonstrate how Plaintiff's TE date was calculated on September 11, 2013, July 2, 2014, and November 18, 2014, based on the amount of good time credits Plaintiff had on those specific dates, the good time credits he could have earned if he maintained the class he had on those specific dates, and the law in effect on those specific dates.  When deciphering those Calculation Sheets, it is important to remember that the "Sentence Begins Date" is the date Plaintiff's good time credits start to count towards his *methamphetamine conviction.  Doc. 48 at Exs.  2, 3, and 4; Doc. 69 at Exs. 1, 2, 3, & 4; Doc. 77 at Ex. 1.*

Accordingly, Defendants are entitled summary judgment, as matter of law, on Plaintiff's retaliation claim, and that claim should be dismissed, with prejudice.

**B.    Equal Protection Claim**

Plaintiff, who is African-American, alleges that Defendants violated his equal protection rights by calculating shorter TE dates for white inmates serving sentences subject to the 70% rule.  To prevail on that equal protection claim, Plaintiff must demonstrate that Defendants purposefully treated him differently from similarly situated inmates based on his race.  *See Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008); *Lewis*, 486 F.3d at 1028-29 (8th Cir. 2007).

Plaintiff has failed to identify any similarly situated white inmate, *with the same sentence and extensive disciplinary history,* who received a more favorable TE date. *See Habhab v. Hon*, 536 F.3d 963, 967 (8th Cir. 2008) (affirming summary judgment where a plaintiff failed to produce evidence demonstrating that he was treated differently than similarly situated individuals).

Instead, Plaintiff relies on ADC statistical data showing that, from 2009 to 2014, a total of 465 inmates subject to the 70% rule were transferred to the Department of Community Correction. Only 5 of those 465 prisoners were African-American. *Doc. 45 at Exs. 6 & 7.*  However, that data does *not* reflect the length of each prisoner's sentence, and more importantly, their disciplinary history. Thus, it is

impossible to determine if any of the 460 white prisoners were similarly situated to Plaintiff.

Plaintiff's argument also overlooks the fact that the overwhelming majority of the inmates who are subject to the 70% rule are white. *Id.* For that reason, far more white prisoners have been transferred to the Department of Community Correction than African American prisoners. Thus, the statistical disparity has nothing to do with race or any discriminatory animus by Defendants. *See Foster v. Wyrick*, 823 F.2d 218, 221 (8th Cir. 1987) ("Proof of discriminatory racial purpose is required to establish an equal protection violation; an official act is not unconstitutional solely because it has a racially disproportionate impact").

Plaintiff has failed to produce any evidence suggesting that the white prisoners subject to the 70% rule were granted earlier TE dates based on their race, as opposed to having shorter sentences and/or better disciplinary records. *See Lewis,* 486 F.3d at 1028-29 (explaining that, "to avoid summary judgment" a prisoner must "identify affirmative evidence from which a jury could find proof of . . . race discrimination"). Accordingly, Defendants are entitled to summary judgment, as a matter of law, on Plaintiff's equal protection claim, and that claim should be dismissed, with prejudice.[10]

---

[10]Because they are entitled to judgment as a matter of law on both Plaintiff's retaliation and equal protection claims, there is no need to discuss Defendants' alternative argument that they are also entitled to qualified immunity. *See Schmidt v. City of Bella Villa,* 557 F.3d 564, 574 (8th Cir. 2009) (explaining that, only if the court determines that there is sufficient evidence of a

## IV. Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.      Defendants' Motion Summary Judgment *(Doc. 47)* be GRANTED and this case DISMISSED, WITH PREJUDICE.

2.      Plaintiff's Motion for Summary Judgment *(Doc. 67)* be DENIED.

3.      The Court CERTIFY, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from any Order adopting this Recommendation would not be taken in good faith.

Dated this 30th day of April, 2015.

_____

UNITED STATES MAGISTRATE JUDGE

---

constitutional violation, must it then proceed to the qualified immunity question of whether that constitutional right was clearly established at the time the violation occurred); *Ambrose v. Young*, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) (same).